STATE, Appellant, vs. PULLMAN COMPANY, Respondent.

*June 8—October 10, 1922.*

*Taxation: Sleeping-car companies: Operating on and not owning railroads: Assessment by tax commission: Unit method: Validity: Stock-and-bond method: Capitalization of net earnings: Rate used: Interstate commerce: Apportionment of property within and without the state: Track-mileage and car-mileage systems: Immaterial circumstances: Treasury stock: Intangible value of real estate: Uniformity in taxation.*

1. Under secs. 51.36 to 51.42, Stats. 1913, providing for the taxation of property of corporations owning sleeping-cars used on railroads not owned by the owners of such cars within the state on a valuation based in part upon the entire amount of capital stock of the company invested in its business, the term "capital stock" included more than the franchise granted by the native state of the corporation, and applied to the entire property of such a corporation, tangible or intangible.

2. Said secs. 51.36 to 51.42 are not invalid for failure to prescribe the exact method in which the valuation should be determined, as the statutes relating to assessments generally leave much to the discretion and judgment of the assessor, and if an arbitrary method is adopted which leads to gross overvaluation the courts must condemn it.

3. Where the defendant, a corporation engaged in running sleeping-cars, had been conservatively managed and its shares had a stable value, use of the market value of the shares (the so-called stock-and-bond method) in assessing the valuation was proper; and where the ownership of the cars was separate from that of the railroads over which they were run, capitalization of the net earnings of the sleeping-car business of the corporation was also properly used as a guide in determining the valuation of the property.

4. Capitalization of the net earnings on the basis of six and one-half per cent. was properly used as a guide in arriving at the value, and in the absence of a claim of fraud it is not open for review on the ground that the business of the company is subject to termination at any time, as its contracts with railroads might not be renewed, and that an eight per cent. rate, the dividend rate, should have been used.

5. Under sec. 51.42, Stats. 1913, providing that in assessing property of a sleeping-car company operating cars over railroads within the state which it does not own, the state tax commission shall assess such portion of the entire property as is separately and legally apportionable to the state, taking into

consideration the value of the entire system and of that part thereof within the state (which method is known as the unit rule), is not invalid as levying a tax on the value of foreign cars, since the state may tax its proportionate part of the intangible value of the system which is founded on cars kept in foreign jurisdictions.

6. The valuation of the property as a unit and the imposition of a tax fairly apportioned is not an unjust or illegal burden on interstate commerce, as it is not the business which is taxed but the property of the taxpayer in the state when properly ascertained.

7. Although the sleeping-car company had different contracts with each railroad and there was no continuity of passage from sleeping-cars on one railroad to sleeping-cars on another, in view of the fact that there was a unity of use throughout the system and that the system was a plant or industry under a single management, taxing a portion of the intangible property on the basis of the tangible property within the state was proper.

8. Under sec. 51.42, Stats. 1913 (providing that the property of a sleeping-car company should be assessed by the state tax commission, taking into consideration the value of the entire system and that part within the state, the earning capacity of the entire system and that part within the state, its entire mileage and mileage within the state, and the car mileage of the entire system and the car mileage within the state), the commission, in its estimates and computations, could make use of the track-mileage and the car-mileage systems.

9. The fact that no result obtained by the employment of any one of the different methods used to determine the unit value of the entire sleeping-car business corresponded with the sum held liable to taxation in Wisconsin tends to demonstrate that the commission adopted no arbitrary rule in making the assessment, but that it took into consideration all the material facts authorized by the statute and exercised its best judgment.

10. The fact that there were proportionately fewer steel cars used in Wisconsin than were employed on the whole system everywhere does not necessarily affect the result where the rates were the same on each class of cars used.

11. The fact that the earnings per car mile on lines which touched the state were less than the general average for the system throughout the country was not sufficient to show the unreasonableness of the system of valuation.

12. Failure to deduct treasury stock, if error, was not prejudicial, in view of the fact that the stock-and-bond method of arriving at the valuation was only one of several used and that the difference was so small in view of the amount involved

that it did not influence the commission in fixing its valuation.

13. In assessing the value of the property of a sleeping-car company under secs. 51.36 to 51.42, Stats. 1913, which require the application of the unit system, sec. 51.39 (providing that the state tax commission must deduct the "actual value" of all the company's real estate situated without the state) must be followed, and a deduction for intangible value based on real estate situated without the state was error.   But this error will not result in setting aside the assessment, as there were other errors or discrepancies which may have affected the computations to the advantage of the defendant, and the assessment will not be interfered with unless a fundamentally wrong principle has been adopted which has caused excessive and unjust taxation.

14. Secs. 51.36 to 51.42, Stats. 1913, providing that the valuation of the property of sleeping-car companies operating on railroads they do not own shall be arrived at by certain methods of comparison of the mileage of railroads operated on in the state with the total mileage operated on, are not unconstitutional as conflicting with the constitutional provision for uniformity of taxation because sleeping-cars operated by railroads within the state are taxed as a part of their general property, since the statutes require the property of railroad companies to be valued on the same basis as the general property of the state; and the fact that different methods may be used in fixing the cash value of the property in each case does not violate the rule as to uniformity.

APPEAL from a judgment of the circuit court for Dane county: E. RAY STEVENS, Circuit Judge.   *Reversed.*

Action by the attorney general in the name of the state to collect a tax assessed against the *Pullman Company* for the year ending June 30, 1913.

The tax assessed amounted to $21,298.38.   The *Pullman Company* tendered $10,728, claiming that to be the greatest amount which could be assessed against it.   The tender was refused, and thereupon the company offered this amount in part payment of its tax and it was received as such.

The sections of the Statutes of 1913 which prescribed the method of taxing the property of sleeping-car companies were as follows:

Sub. (1), sec. 51.36, provided that any corporation (not

being a railroad company or lessee of a railroad company) "when owning any cars known as dining, buffet, chair, parlor, palace or sleeping-cars which are used upon railroads within this state, unless the ownership of such cars be identical with that of the lines of railroads on which they are operated, shall be deemed and held to be a sleeping-car company."

Sec. 51.37 provided, in substance, that the companies defined in the preceding section should, during the month of July, file a verified report with the tax commission stating the name and nature of the business; the location of the principal office; the name and address of one of the principal officers; the name and address of the chief officer in Wisconsin; the capital stock, both authorized and issued, and, if a sleeping-car company, the total amount of its capital stock invested in the sleeping-car business; the number of shares of stock, outstanding, not issued, and treasury; the par and market value of the shares of stock, or, if there be no market value, the actual value of all the shares of its capital stock invested in its business; and a statement of the situation, income, and value in detail of all its real estate in Wisconsin.

There was also required by sec. 51.37:

"(10) A full and correct inventory, at the true cash value, of its personal property, including moneys and credits in Wisconsin.

"(11) The location, character, and total value of all its real estate outside of Wisconsin used in its business.

"(12) The total value of all its personal property, including moneys and credits situated outside of Wisconsin.

"(13) The whole length and the names of railroad lines . . . over which it did business, and separately, in detail, the portions of such lines . . . within this state, . . .

"(14) Such other facts or information as such company may deem material upon the question of the taxable value of its property within this state; and such other facts or information as the tax commission shall call for."

Sec. 51.38 made provision as to the time of making the assessment and for notice to the companies in order to allow them to be heard, and in addition contained the language:

"Sleeping-car property, as defined by section 51.36, which is owned and operated by any railroad company taxed under the provisions of this chapter, is exempt from assessment under this section, and from all taxation pursuant to such assessment."

Sec. 51.39 provided the method of assessment as follows:

"The tax commission shall carefully consider all reports made pursuant to section 51.37 and all other facts and evidence collected or available, and after hearing the testimony and arguments which each company defined in section 51.36 may offer, shall proceed to determine the true value in money of the entire property of each such company in this state, according to the following rules:

"(a) It shall find, ascertain and determine the actual value in money of the entire amount of the capital stock of each such company invested in its business; and from the amount so obtained and determined it shall deduct the actual value of all its real estate situate without this state, and the actual value of all its personal property not used in its business. The remainder shall be taken and considered as the actual value of the capital stock of such company invested in its business.

"(b) The commission shall then divide the amount so obtained by the total number of miles of railroad . . . routes over which the company did business, to obtain the value per mile, and shall then multiply the value per mile thus obtained by the total number of miles of such routes within this state, . . . and the result shall be taken and considered as the actual value of the property of such company subject to assessment and taxation in this state.

"(c) The commission shall thereupon assess such value, and shall levy a tax thereon for the use of the state at the average rate of taxation, state and local consolidated, of this state, certifying such assessment and levy to the state treasurer, who shall thereupon, by registered letter, notify the officer attesting the report of such company, the amount

of the assessment, the rate of levy and the amount of the tax; and such company shall have thirty days after the mailing of such notice within which to pay said tax to the state treasurer. And such tax when paid shall be in lieu of all other taxes and licenses of every nature against such company."

"Sec. 51.42. *Powers of investigation; apportionment of property; levy; tax roll.* For the purpose of determining the true cash value of the property of each company described in section 51.36, including the value of its franchises, the commission may view and inspect any of its property, and may consider the reports filed in compliance with law, and any reports and returns of the company in the office of any officer of this state, or any public office in any other state, and such other evidence or information as may have been taken or obtained, bearing upon the true cash value of the property and franchises of such company. In case of companies doing business partly within and partly without this state the commission shall assess such portion of the entire property as is properly and legally apportionable to this state, taking into consideration the value of the entire system and of that part thereof within this state, the earning capacity of the entire system and of that part within this state, its entire mileage and the mileage within this state, the car mileage of the entire system and the car mileage within this state, and such other information, facts and circumstances as will aid the commission to make a substantially just and correct determination of the valuation of so much of said property as is subject to taxation in this state. In ascertaining the mileage for the entire system of any company or in this state, water, coastwise and ocean mileage may be excluded. When the true cash value of the property of any such company liable to taxation in this state shall have been ascertained and determined, the amount thereof shall be entered upon an assessment roll, to be prepared by the commission, opposite the name of the company assessed, and shall be and constitute the assessment of the entire property and franchises of such company within this state. . . ."

Pursuant to the foregoing sections the *Pullman Company* filed its report and thereafter the tax commission notified

the company that the value of its property taxable by the state was $1,800,000; the letter also containing notice of hearing.   At the hearing the company protested upon several grounds that the amount fixed by the commission was greatly in excess of the value of the property subject to taxation.   After the hearing some changes were made in the preliminary estimates, one of which was an increase of the amount and value of real estate to be deducted.. The commission, however, refused to change the assessment; the state treasurer was notified of the amount determined, and upon refusal of the company to pay a portion of the tax, as noted above, an action was begun in circuit court for its collection.

The answer of defendant, after denying any indebtedness for the tax in question, was as follows: That defendant is a corporation created and existing under the laws of Illinois; that it has an authorized capital of $120,000,000 divided into 1,200,000 shares of the par value of $100 each; that it is engaged in two separate and distinct lines of business, one of which is the manufacture and sale of all kinds of cars to steam and street railways, and that for the carrying on of this business it owns a factory, a large amount of machinery, equipment, and tracts of land in the state of Illinois; that the other business in which it is engaged is the furnishing of sleeping, dining, and parlor cars for use in passenger trains in the United States, Mexico, and Canada; that in connection with such business it maintains extensive repair shops, and pays taxes thereon, in several states other than Wisconsin; that the business of defendant of furnishing cars on railroads which run in, into, or through Wisconsin is not appurtenant to the business of furnishing cars on railroads which do not run in, into, or through the state of Wisconsin, and are chiefly run in interstate commerce, and between the United States and Mexico and Canada; that for the year ending June 30, 1913, over twenty-eight per cent. of all the cars defendant

furnished to railroads, as above mentioned, were of steel construction and approximately three times the value of wooden cars; that the value of the cars used in Wisconsin, apportionable in the ratio that the miles over which the cars run in Wisconsin bears to the miles over which they run in Wisconsin and elsewhere, was of an amount not to exceed $555,379.82; that by reason of the fact that only sixteen per cent. of the cars used in Wisconsin were of steel construction, the value of the cars used in Wisconsin would be only eighty-two per cent. of the proportion to Wisconsin of all of the defendant's cars so operated everywhere, upon a mileage basis; that the revenue per car mile on all the lines running in, into, and through the state of Wisconsin was not equal to the revenue per car mile on all the lines of defendant everywhere, but was not to exceed eighty-three per cent. of the average revenue per car mile; that in addition to the cars employed in its business, the defendant, during the year 1913, had real estate of the value of $10,173,154.13, of which amount $3,476,065.58 was employed in the sleeping-car business, none of which property was situated in the state of Wisconsin; that defendant also owned material and supplies for repairing and manufacturing cars and for equipping its cars of the value of $6,657,967, of which $2,170,852.65 was employed in said sleeping-car business, no part of which, with the exception of an amount not exceeding in value $512, was within the state of Wisconsin; that the commission in determining the value of defendant's property in Wisconsin failed to make allowance for the fact that the average revenue per car mile on lines in the state of Wisconsin did not exceed eighty-three per cent. of the average revenue per car mile on defendant's lines everywhere; nor that the apportioned value of the cars in Wisconsin did not exceed eighty-two per cent. of the full proportion, according to mileage ratio, of all cars of defendant.

It was further alleged that the section under which the

tax commission computed the value of defendant's property in Wisconsin prescribed a method which could not give the true value, since the value of defendant's capital stock was not due to the property in the state of Wisconsin or to business done in the state of Wisconsin, but resulted because of the entire property, including real estate in other states; property employed in manufacturing in other states; property invested in cash and bonds and other corporate securities not used in the sleeping-car business or in any business conducted by defendant in the state of Wisconsin, all of which property, cash, bonds, and other securities are located without the state of Wisconsin, and have no connection in any manner with the business conducted in Wisconsin.

For a further defense defendant alleged that the tax in question was levied under a section which prescribed a method of taxing sleeping-car property of defendant different from that employed in assessing the tax on the general property in the state and different from the method employed in taxing sleeping-car property owned by railroads, and that for these reasons the constitutions of the state of Wisconsin and of the United States were violated.

The tax commission presented an exhibit which showed that for the five years ending June 30, 1913, the shares of stock of the *Pullman Company* sold on the New York stock exchange for an average price of $171.11 per share; that during the year ending June 30, 1913, there were sold 41,938 shares for $6,845,775, or an average price of $163.235 per share. The company in its report gave the market value of its shares as $153 per share, that being the price at which a few shares were sold on the exchange on June 30, 1913, but stated that the actual value was not to exceed $130 per share. The company had no bonded debt.

The report of the company filed with the tax commission contained, in part, the following items:

State v. Pullman Co. 178 Wis. 240.

Number of shares of stock represent-
     ing all branches of the business..................1,200,000
     Outstanding ..........1,178,625
     Treasury ..............     21,375
Gross receipts—
     All branches of the business...................  $72,708,732 68
     From sleeping-car business...................  40,103,216 27
Net earnings—
     All branches of the business................  10,784,953 92
     From sleeping-car business..................   8,720,487 79
Book value—
     Of entire property.........................  159,401,413 15
     Of sleeping-car business....................  121,610,397 62
Actual value—
     Of entire property.........................  96,339,060 10
     Of sleeping-car business....................  62,214,108 88
Total length of lines of railroad over which cars of
     company were used in Wisconsin and elsewhere       181,425
Total length of lines of railroad on which cars of
     company were used in Wisconsin ....:........         2,496
Car mileage—
     On all lines.................................  697,363,023
     In Wisconsin................................   10,232,085

The tax commission computed the value of the property taxable by Wisconsin as follows: the total number of shares of stock, 1,200,000, was multiplied by $163.24, the average market value of each share of stock as shown by the sales for the previous year on the New York stock exchange, and the product, $195,888,000, was taken, tentatively, as the value of the company's entire capital stock. Estimates of the entire value were also made on the basis of the market value as shown by the sales for the last five years, and by the last quotation on June 30, 1913. The results thus obtained represented estimates of the value of the entire business, both sleeping-car and manufacturing.

The value of the entire sleeping-car business was estimated by four methods of apportionment: first, on the basis of gross receipts in the sleeping-car business as compared with the receipts from the total business; second, the same procedure with the net receipts; third, the book value of the sleeping-car business as compared with the book value of

the entire business; and fourth, the same method applied to the actual values. The information for these estimates was taken from the company's report. Further estimates of the value of the entire sleeping-car business were made by capitalizing the net earnings of the sleeping-car business at six per cent. and six and one-half per cent. on the basis of the past year's net profits, and also on the basis of net earnings for the last five years.

To determine what part of the entire sleeping-car business was apportionable to Wisconsin the commission used two methods. By the first, that of track mileage, the number of miles over which the company operated in Wisconsin was divided by the number of miles over which the company operated everywhere; by the second, car mileage, the total number of miles traveled by the cars in Wisconsin was divided by the total number of miles traveled everywhere. The results are listed below.

*Value of Capital Stock.*

1,200,000 shares at—
    Par value, $100 per share.....................$120,000,000
    Market value—
        $163.24 per share, total sales, one year..... 195,888,000
        171.11 per share, total sales, five years..... 205,332,000
        153.00 per share, last quotation .......... 183,600,000

*Proportion of Sleeping-car Business to Entire Business.*
        Gross-receipts method, 55.156 %.
        Net-receipts method, 80.858 %.
        Book-value method, 76.292 %.
        Actual-value method, 64.578 %.

*Proportion of Wisconsin Business to Entire Sleeping-car Business.*
        Track-mileage method, 1.3757 %.
        Car-mileage method, 1.467 %.

The value of the entire sleeping-car business as estimated by the capitalization of net-earnings method was as follows:

Net profits capitalized at 6 %—
    Year ending June 30, 1913....................$145,341,450
    Five years ending June 30, 1913............... 141,485,516

Net profits capitalized at 6½ %—
    Year ......................................$134,161,338
    Five years ................................ 130,602,015

The state introduced in evidence an exhibit showing twenty-eight estimates of the value of the company's property taxable in Wisconsin, made by the methods previously stated. The lowest of these, $1,346,706, represented 1.376% (track-mileage basis) of 55.2% (gross-receipts basis) of $183,600,000, the value of the entire business as estimated at $153 per share, the price last quoted on the exchange. The highest, $2,385,000, was determined by taking 1.467% (car-mileage basis) of 80.9% (net-earnings basis) of $205,332,000, the value of the entire business estimated at $171.11 per share, the average sales price for the five-year period ending June 30, 1913.

In making these estimates the commission deducted from each value assigned to the whole sleeping-car business $3,476,065, the value of real estate outside of Wisconsin used in the sleeping-car business.

The company introduced in evidence exhibits showing that during the year ending June 30, 1913, its cars engaged in service in, into, and through Wisconsin traveled a distance of 24,399,432 miles, of which 10,279,614 miles were run in Wisconsin. The total value of these cars, allowing for depreciation, was $1,407,103.57, and the proportion to Wisconsin, on the above ratio of miles run in Wisconsin to the total number of miles run, was $670,918.60. It was shown that of the authorized capital stock, 1,200,000 shares, there were in the treasury of the company 21,375 shares, and that the par value of the shares outstanding was $117,862,500. The value of its shares of stock, according to the average sales price for the previous year, on the exchange, was $163.24 per share, and at this price the value of the outstanding stock, or entire business, was $192,398,745. The net assets of the company were given as $132,639,661.55.

The difference between these two, $59,759,083.45, represented the corporate excess, or intangible value, and Wisconsin's proportion of this, on the ratio of the actual value to the enhanced value, amounted to $302,504.33. This, added to the actual value of its supplies in the state, $512, and to Wisconsin's proportionate value of the cars running in, into, and through the state of Wisconsin, gave the sum of $973,934.93 as the value of the company's property taxable by Wisconsin.

Many tables and much documentary evidence were before the commission and the trial court which are not necessary to include. Table 23 was prepared by an expert of the commission and has been referred to by both parties so much that it is included, and is set out on page 253.

The trial court found as facts that secs. 51.36 to 51.42, Stats. 1913, were not in conflict with any provisions of either the state or federal constitution; and that in making the assessment the tax commission adopted a fundamentally erroneous principle in valuing the real property of the company, in that it attributed all the intangible value of the company's real property to the unit valuation of its property which was apportionable to Wisconsin, thereby rendering subject to taxation in Wisconsin property which was outside the state and which had its actual use entirely separate from the parts of the property of the company which were operated within and subject to taxation in the state of Wisconsin.

Judgment was entered dismissing the complaint.

For the appellant there was a brief by the *Attorney General* and *Geo. B. Hudnall* of Milwaukee, special counsel for the state, and oral argument by *Mr. Hudnall.*

For the respondent there were briefs by *George D. Van Dyke* of Milwaukee, attorney, and *Gustavus S. Fernald* of Chicago, general counsel for the respondent company, and oral argument by *Mr. Van Dyke* and by *Mr. L. M. Greenlaw* of Chicago.

State v. Pullman Co. 178 Wis. 240.

Exhibit 23.

VALUATION ON DIFFERENT BASES.

VALUE OF SLEEPING-CAR BUSINESS ON DIFFERENT BASES AND PROPORTIONATE VALUATION ASSIGNED TO WISCONSIN AT 1.376% AND 1.467% RESPECTIVELY

(From each value assigned to sleeping-car business $3,476.065 has been deducted for Real Estate without the state of Wisconsin.)

| Valuation of Entire Property on Different Bases. | Net Earnings Basis (80.9%) | | Property Basis—Book Value (76.3%) | | Property Basis—Actual Value (64.6%) | | Gross Receipts Basis (55.2%) | |
|---|---|---|---|---|---|---|---|---|
| | Value Sleeping Car Property minus Real Estate | Values to Wisconsin at 1.376% and 1.467% | Value Sleeping Car Property minus Real Estate | Values to Wisconsin at 1.376% and 1.467% | Value Sleeping Car Property minus Real Estate | Values to Wisconsin at 1.376% and 1.467% | Value Sleeping Car Property minus Real Estate | Values to Wisconsin at 1.376% and 1.467% |
| 1,200,000 Shares at $163.24 (one year) $195,888,000........ | $154,997,235 | $2,132,761 / 2,273,809 | $145,986,479 | $2,008,773 / 2,141,621 | $123,067,583 | $1,693,409 / 1,805,401 | $104,654,101 | $1,440,040 / 1,535,275 |
| 1,200,000 Shares at $153 (last quotation) $183,600,000........ | 145,056,335 | 1,995,975 / 2,127,976 | 136,610,735 | 1,879,763 / 2,004,079 | 115,029,535 | 1,582,806 / 1,687,483 | 97,871,135 | 1,346,706 / 1,435,769 |
| 1,200,000 Shares at $171.11 (five years) $205,332,000........ | 162,687,523 | 2,237,892 / 2,385,892 | 153,192,251 | 2,107,925 / 2,247,330 | 129,108,407 | 1,777,357 / 1,894,900 | 109,867,199 | 1,511,772 / 1,611,751 |
| Net Earnings from Sleeping-Car Business, 1913.........$8,720,487 | Capitalized at 6% $145,341,450 / Capitalized at 6½% $134,161,338 | | Subtract for Real Estate Outside $3,476,065 | | $141,685,385—to Wisconsin / $130,685,273—to Wisconsin | | $1,952,060 at 1.376% / $2,081,165 at 1.467% / $1,798,229 at 1.376% / $1,917,152 at 1.467% | |

The following opinion was filed July 26, 1922:

JONES, J.    Counsel for the state and the defendant are agreed that ch. 768, Laws 1913, revises and consolidates the pre-existing statutes relating to the taxation of sleeping-car companies, and that, as grouped together in the Statutes of 1913, secs. 51.36 to 51.42, they are all to be considered in arriving at the legislative intent. It is also agreed that they are to be so construed as to authorize the assessment of only such portion of the property in question as is properly and legally apportioned to this state. It may be taken for granted that the state has no right to subject to taxation property outside the state and that the adoption of a rule which prevents a just and fair apportionment of the total value of the property would have to be condemned.

Counsel do not agree upon the meaning to be given to the following clause in sec. 51.39, above quoted:

"The tax commission . . . shall proceed to determine the true value in money of the entire property of each such company in this state, according to the following rules:

"(a) It shall find, ascertain and determine the actual value in money of the entire amount of the capital stock of each such company invested in its business."

Counsel for the company claim that this clause does not include any intangible values arising from the personal element of efficient management or organization, unearned increment, and good will in which none of the capital was invested, and that it does not authorize the methods of valuation of the entirety adopted by the commission.

In construing sec. 51.42, quoted in the statement of facts, which provides for determining the true cash value, including the value of its franchises, they argue that although by our law special privileges and franchises are property which may be made the subject of an *ad valorem* property tax, such special privileges or franchises may not be taxed except by the state or government which creates them.

It is claimed that the company owned no special privileges or franchises granted by the state of Wisconsin; that the license to do business in this state gave no right to levy taxes on its franchise; and that, as the corporation was chartered by the state of Illinois, Wisconsin had no right to tax its corporate franchise.

It is further argued that the company required no license to carry on an interstate business and that less than ten per cent. of its business in Wisconsin was intrastate.

It is also claimed that the state has provided no appropriate or legal method for determining the part of the intangible value which accrued or had a situs in this state.

Counsel agree that the two sections are to be construed *in pari materia.* The fact that they are part of a revision of former statutes must explain inconsistencies or ambiguities if they exist.

Prior to 1899 sleeping-car companies had been taxed on the basis of a percentage of their gross earnings. By ch. 112, Laws 1899, the system was changed to the *ad valorem* method, and that statute related to the taxation of sleeping-car companies only. Chs. 111, 113, and 114 provided for the taxation of express, freight line, and equipment companies. By ch. 477, Laws 1905, the provisions of the various chapters were combined and revised. Although in the earlier statute the thing to be ascertained was the "actual value in money" and in the later "true cash value," there was no real difference in the meanings of the clauses.

The original statute, like the later one, required the company to report the total amount of its capital stock invested in the sleeping-car business, the number of shares invested in its business, the situation and value of its real estate in and out of Wisconsin, its personal property, and the mileage used in Wisconsin and elsewhere. The statute then provided the mode of apportionment to ascertain the value per mile.

Construing the statutes together and the history of the legislation, we think it would be too narrow a construction

of the statute to hold as argued by counsel for defendant that the entire amount of the capital stock of the company invested in its sleeping-car business included only such franchises as were granted by the state of Illinois. It is also clear that the term "capital stock" as used in the statutes meant something different from the shares of stock. The term as used in both statutes included the entire property of the company, tangible and intangible. *Louisville & N. R. Co. v. Greene,* 244 U. S. 522, 535, 37 Sup. Ct. 683; *State Railroad Tax Cases,* 92 U. S. 575.

Counsel for the company urge against the validity of the statute that it does not provide any method for determining the value of the property of the company. Although the commission is expected to consider the reports and returns made by the company and such other evidence or information as may have been taken or obtained, the statute prescribes no specific rule for determining the value of the entire property of the company. The statute might have prescribed in greater detail the rules to be applied in arriving at the value of the entire property of the company, but does it necessarily follow that it was bound to do so?

By our general statutes relating to the assessment of real and personal property the object is to ascertain the full value which could ordinarily be obtained for the property at private sale, or the true cash value. Some directions are given in the statute as to the mode of ascertaining these ultimate facts, but very much is left to the discretion and judgment of the assessor. Secs. 70.32, 70.34, Stats.

Of course, if a method adopted is arbitrary and leads to a gross overvaluation, it must be condemned by the courts.

Mr. Haugen, one of the members of the tax commission, testified as follows:

"We capitalized the net earnings of the company that were used in the sleeping-car business and made deduction in that case of the real estate that was set forth in their report—that is, real estate that was used in the sleeping-

car business,—and we also had before us the stock-and-bond valuation, and from the stock-and-bond valuation we deducted all the property that was not used in the sleeping-car business."

Counsel for the company argue that the market value of shares has no necessary relation to the actual value of the property to be valued; that excessive dividends paid, or manipulations by speculators, may give a fictitious value to the stock; and that the method adopted by the commission in this respect is too uncertain and delusive to be relied on.

In this case the commission estimated the market value of the shares, first, on the date of the assessment; second, on the average for one year preceding that date; and third, on the average for five years preceding. This gave the results named in the statement of facts. This mode, often used as one of the means of arriving at the value of corporate property, is commonly called the stock-and-bond method. The defendant company differed from most great corporations at the time of the assessment in the fact that it had no bonded debt; hence the bond element, often an important matter, was eliminated. The company had long been conservatively managed, had paid its dividends regularly for many years, and the stock was not subject to those great and sudden fluctuations which are common in speculative concerns.

The commission did not accept any one of the sums arrived at from the sales of stock at any one of the periods above named, but considered them all in using the stock-and-bond method as one of the elements in ascertaining value. These sales on the market represented the judgment of business men who presumably had acquired fair knowledge of the financial condition of the company. The following language, used in an opinion of the supreme court of Ohio, was quoted approvingly by the supreme court of the United States:

"If the market value—perhaps the closest approximation to the true value in money—of the corporate property as a

whole were inquired into, the market value of the capital
stock would become a controlling factor in fixing the value
of the property.   Should all the stockholders unite to sell
the corporate plant as an entirety, they would not be in-
clined to sell it for less than the market value of the aggre-
gate shares of the capital stock."   *State v. Jones,* 51 Ohio
St. 492, 37 N. E. 945; *Adams Exp. Co. v. Ohio,* 165 U. S.
194, 224, 17 Sup. Ct. 305.

In another leading case Mr. Justice MILLER said:

"It is therefore obvious that, when you have ascertained
the current cash value of the whole funded debt, and the
current cash value of the entire number. of shares, you
have, by the action of those who above all others can best
estimate it, ascertained the true value of the road, all its
property, its capital stock, and its franchises; for these are
all represented by the value of its bonded debt and of the
shares of its capital stock." *State Railroad Tax Cases,* 92
U. S. 575, 605.

In another important case, in this state, Mr. Justice
MARSHALL said in the opinion:

"The board considered the report of the person who, as
before suggested, performed the feat of separating and
valuing the physical property, the market price as to each
company of its bonds and stocks for a period of five years,
reports of the engineers of the railway companies as to the
physical property, the gross and net earnings of each com-
pany, both in the whole and in this state, and other ele-
ments, and fixed the value of the entire property of each
company in this state at its due proportion of the value of
the entire system, not giving to any particular factor of
the evidence any particular weight separate from the other,
nor placing any particular value upon any particular ele-
ment of the property separate from the rest.   We see no
infirmity in that in any respect."   *Chicago & N. W. R. Co.
v. State,* 128 Wis. 553, 622, 108 N. W. 557.

Although counsel for the company cite some exceptional
cases criticising this view, we consider the rule well estab-
lished that in arriving at the value of corporate property for

purposes of taxation one of the useful and important elements for consideration is the value of the stock and bonds of the corporation. *Adams Exp. Co. v. Ohio,* 165 U. S. 194, 224, 17 Sup. Ct. 305; *S. C.* 166 U. S. 185, 220, 17 Sup. Ct. 604; *W. U. Tel. Co. v. Taggart,* 163 U. S. 1, 16 Sup. Ct. 1054; *Pittsburgh, C., C. & St. L. R. Co. v. Backus,* 154 U. S. 421, 429, 14 Sup. Ct. 1114; *Louisville & N. R. Co. v. Greene,* 244 U. S. 522, 540, 37 Sup. Ct. 683; *Chicago U. T. Co. v. State Board of Equalization,* 112 Fed. 607, 611.

Another method used by the tax commission was that known as capitalization of net earnings; not the earnings from all branches of its business, but only those of the sleeping-car business. The statute did not prescribe this method, and it is claimed by counsel for defendant that the statute is illegal for this reason; that the statute should have prescribed the rule and fixed the rate of capitalization, with different rates for different kinds of business classified with regard to their permanency and risks; and that the failure to do so leads to discrimination and non-uniformity in taxation.

This raises again the question whether statutes relating to the assessment of property are to be condemned as illegal because they fail to prescribe in detail the methods to be pursued by taxing officers in the performance of their duty. This seems to us rather a question of legislative policy than one for the consideration of the courts, but we have grave doubts whether a policy greatly limiting the discretion of taxing officers by many detailed rules would be an improvement over the methods generally prevailing. For the legislature to undertake to classify different kinds of business and prescribe for each the percentage to be used in capitalizing its earnings might lead to results far more unsatisfactory and unjust than those produced by the present method.

Defendant's counsel urge as an objection to the capitalization-of-earnings plan that it is based on the fallacious assumption that the earnings will continue. This is an ob-

jection which could be urged with equal force whenever net earnings are being considered in determining the value of property. But it cannot be denied that the value of property is affected by its net earning capacity. That capacity is generally recognized as proper for consideration in the assessment of office buildings and other kinds of property.

The net earnings of a very expensive property may be comparatively small, or those of property in which little capital has been invested may be by reason of temporary causes very large. Of course such facts should be considered and due weight should be given to them, and it must always be borne in mind that it is not the earnings but the property which is to be taxed. It is not the gross but the net earning capacity, not the speculative earnings anticipated in the future, but the present earning capacity, which is to be considered.

It is also important that the earning capacity is only one of other elements which enter into the valuation of property. The net earnings of a corporation long established and conservatively managed are very closely connected with the market value of its shares, and when both are considered there are few if any better guides for arriving at the true value of the concern.

The rule was well stated by Mr. Justice BREWER in *Cleveland, C., C. & St. L. R. Co. v. Backus,* 154 U. S. 439, 445, 14 Sup. Ct. 1122:

"The rule of property taxation is that the value of the property is the basis of taxation. It does not mean a tax upon the earnings which the property makes, nor for the privilege of using the property, but rests solely upon the value. But the value of property results from the use to which it is put and varies with the profitableness of that use, present and prospective, actual and anticipated. There is no pecuniary value outside of that which results from such use. The amount and profitable character of such use determines the value, and if property is taxed at its actual cash value it is taxed upon something which is created by the uses to which it is put."

Among the large number of cases which have recognized the rule are the following: *Louisville & N. R. Co. v. Greene,* 244 U. S. 522, 37 Sup. Ct. 683; *Adams Exp. Co. v. Ohio,* 166 U. S. 185, 220, 17 Sup. Ct. 604; *Chicago & N. W. R. Co. v. State,* 128 Wis. 553, 108 N. W. 557; *Duluth St. R. Co. v. Railroad Comm.* 161 Wis. 245, 152 N. W. 887; *State v. Ill. Cent. R. Co.* 27 Ill. 64. For numerous illustrations of cases where the rule has been applied in the valuation for taxation purposes of the property of sleeping-car companies, express companies, water companies, telephone and telegraph companies, see note in L. R. A. 1916C, 541. We see no good reason why this method so often applied to other industries and properties was not properly used as one of the guides in this case.

Counsel for defendant argue that even if capitalization of net earnings is a proper factor to be considered, the percentages used, six and six and one-half per cent., were unfair; that the sleeping-car business of the company is subject to termination at any time, since it owned no tracks and its contracts might not be renewed. They argue that an eight per cent. rate at least, the dividend rate, should have been used. There is abundant authority for the action of the commission in this respect. *Ill. Cent. R. Co. v. Greene,* 244 U. S. 555, 561, 37 Sup. Ct. 697; *Louisville & N. R. Co. v. Greene,* 244 U. S. 522, 540, 37 Sup. Ct. 683; *State v. Virginia & T. R. Co.* 24 Nev. 53, 49 Pac. 945, 50 Pac. 607.

The subject involved the consideration of current rates of interest, the financial condition of the company, and general economic and financial conditions, all of which were subjects peculiarly within the province of the tax commission. No fundamentally wrong principle was adopted and no fraud is claimed, hence this question is not open for review. See cases last cited.

Counsel for the company concede that the state of Wisconsin may lawfully tax a fair proportion of defendant's cars which habitually are operated on lines which pass in,

State v. Pullman Co. 178 Wis. 240.

into, through, and out of Wisconsin, and at a valuation not merely as separate articles but as part of the car line of which they are a part. But it is urged that no part of the value of foreign cars, tangible or intangible, which never enter or touch Wisconsin can be allocated to this state. Although it is clear that the state has no jurisdiction to tax property beyond its borders, on the other hand no claim is made that the taxation in this case should be confined to the physical value of the property of defendant in Wisconsin.

It is the mandate of the statute that the commission "shall ' assess such portion of the *entire property* as is properly and legally apportionable to this state, taking into consideration the value of the entire system and of that part thereof within this state." In other words, for the purpose of ascertaining the value of the taxable property of defendant in Wisconsin the legislature adopted what is known as the unit rule. This rule was thus stated by the supreme court of the United States:

"As to railroad, telegraph, and sleeping-car companies engaged in interstate commerce, it has often been held by this court that their property, in the several states through which their lines or business extended, might be valued as a unit for the purposes of taxation, taking into consideration the uses to which it was put and all the elements making up aggregate value, and that a proportion of the whole fairly and properly ascertained might be taxed by the particular state, without violating any federal restriction. *W. U. Tel. Co. v. Massachusetts,* 125 U. S. 530, 8 Sup. Ct. 961; *Massachusetts v. W. U. Tel. Co.* 141 U. S. 40, 11 Sup. Ct. 889; *Maine v. Grand Trunk R. Co.* 142 U. S. 217, 12 Sup. Ct. 163; *Pittsburgh, C., C. & St. L. R. Co. v. Backus,* 154 U. S. 421, 14 Sup. Ct. 1114; *Cleveland, C., C. & St. L. R. Co. v. Backus,* 154 U. S. 439, 14 Sup. Ct. 1122; *W. U. Tel. Co. v. Taggart,* 163 U. S. 1, 16 Sup. Ct. 1054; *Pullman's P. C. Co. v. Pennsylvania,* 141 U. S. 18, 11 Sup. Ct. 876. The valuation was, thus, not confined to the wires, poles, and instruments of the telegraph company; or the roadbed, ties, rails, and spikes of the railroad company;

or the cars of the sleeping-car company; but included the proportionate part of the value resulting from the combination of the means by which the business was carried on, a value existing to an appreciable extent throughout the entire domain of operation." *Adams Exp. Co. v. Ohio,* 165 U. S. 194, 220, 17 Sup. Ct. 305.

There seems little doubt but the state may tax cars habitually used in the state according to their fair value, and that the valuation need not be limited to the mere value of the cars used separately but it may include the intangible value due to what may be called the "organic relation of the property in the state to the whole system." This general theory is recognized not only in the *Adams Exp. Co. Case, supra,* and many others, but also in the case of *Union Tank Line Co. v. Wright,* 249 U. S. 275, 39 Sup. Ct. 276, on which counsel for defendant much rely. *Pullman's P. C. Co. v. Pennsylvania,* 141 U. S. 18, 11 Sup. Ct. 876; *Cudahy Packing Co. v. Minnesota,* 246 U. S. 450, 38 Sup. Ct. 373; *Adams Exp. Co. v. Ohio,* 166 U. S. 185, 17 Sup. Ct. 604; *Chicago & N. W. R. Co. v. State,* 128 Wis. 553, 108 N. W. 557; *American R. T. Co. v. Hall,* 174 U. S. 70, 78, 19 Sup. Ct. 599; *Union R. T. Co. v. Lynch,* 177 U. S. 149, 20 Sup. Ct. 631; *Adams Exp. Co. v. Ohio,* 165 U. S. 194, 221, 17 Sup. Ct. 305.

Nor is the valuation of the property as a unit and the imposition of a tax fairly apportioned any unjust or illegal burden on interstate commerce. It is not the business which is taxed, not the transportation, but the property of the taxpayer in the state, when properly ascertained. It is well settled that although the state cannot interfere with interstate commerce by the imposition of a tax, this restriction does not abridge the right of a state to tax at their full value all the instrumentalities used for such commerce. See cases last cited.

Defendant's counsel claim, however, that whatever may be the law as to the unit rule with respect to such companies

as railroads and telegraph companies doing business in several states, the unit rule should not be applied to defendant; that cars used and business done on lines touching Wisconsin had neither physical connection nor organic relation with the sleeping-car property and business on other lines except that of ownership and management.

There were separate contracts with each railroad. There was no continuous passage between the Eastern lines and those operating in Wisconsin. No Pullman cars passed through Chicago on transcontinental lines. Specific cars were set apart and assigned for use on each separate line. It is argued that the cars used on the different lines had no relation to each other and did not function together, and that the Wisconsin lines gained no advantage from the existence of the other lines.

Such facts as these are strongly urged as furnishing reasons why the unit rule should not be applied to defendant either for purposes of valuation or apportionment. One element of unity found in some of the cases cited is undoubtedly wanting: that of physical connection between the different portions of defendant's property. But the facts that defendant did not own a roadbed or connecting wires extending through various states, and that it had different lines and separate contracts with railroad companies, do not necessarily so distinguish this case from the others cited that the unit rule cannot be applied for taxation purposes. The whole property of the company may still be treated as one plant with a unit value. It is a plant or industry under a single management. Under that management the capital stock had increased from $3,000,000 in 1870 to $120,000,000 in 1913, and according to the lowest estimate the actual value then far exceeded the par value of the capital stock.

There is a unity of use. If the different lines were segregated, owned, and managed by different companies, there is good reason to believe that the aggregate value

would be far less than under the present system. Of course the company had the right to designate as many lines or routes, all parts of its system, as it saw fit. But this does not exempt it from such taxes on its property, tangible or intangible, as were reasonable and just.

It is true, when a passenger buys a ticket from New York to San Francisco he changes from one car to another at Chicago. But he may buy a single ticket from a responsible company which will be honored by Pullman-car conductors throughout his entire journey. Counsel for defendant seek to distinguish the unity of use in the *Express Company Cases* from that in the instant case, arguing that in the former class of cases the express agent receiving the package from the consignor is functionally connected with the agent receiving the package for the consignee and that there is no such connection between the employees of the defendant. But this distinction does not appeal to us. For its own convenience the defendant has established numerous lines or routes, but they are all connected with each other and are all under one management and ownership. The cars operated on these several lines are undoubtedly far more valuable by reason of the fact that they are so used as part of a great system and going concern.

The testimony shows that the value of the cars used in Wisconsin taken separately is far less than their value as part of a going concern. The cases already cited show beyond question that it was proper to tax so much of this intangible value as was properly allocated to Wisconsin. The plan proposed by defendant's counsel would prevent the taxation of most if not all of this intangible value and would work injustice to the other taxpayers of the state. On this point the language of Mr. Justice BREWER is quite pertinent:

"It matters not in what this intangible property consists— whether privileges, corporate franchises, contracts, or obligations. It is enough that it is property which though in-

tangible exists, which has value, produces income, and passes current in the markets of the world. To ignore this intangible property, or to hold that it is not subject to taxation at its accepted value, is to eliminate from the reach of the taxing power a large portion of the wealth of the country. Now, whenever separate articles of tangible property are joined together, not simply by a unity of ownership, but in a unity of use, there is not infrequently developed a property, intangible though it may be, which in value exceeds the aggregate of the value of the separate pieces of tangible property. Upon what theory of substantial right can it be adjudged that the value of this intangible property must be excluded from the tax lists, and the only property placed thereon be the separate pieces of tangible property?" *Adams Exp. Co. v. Ohio,* 166 U. S. 185, 219, 17 Sup. Ct. 604.

This brings us to the question whether the statute or the plan adopted by the commission for apportioning the property of defendant in Wisconsin should be sustained. This is an important question, since if a fundamentally wrong principle was adopted which would necessarily lead to grossly excessive and unjust taxation, the method would have to be condemned.

In 1873, in the matter of the *Delaware Railroad Tax,* there was a statute containing a proviso that when the line of a railroad belonging to a company liable to a tax lay partly within the state and partly in an adjoining state or states the company should only be required to pay the tax on such number of shares of its capital stock as would be that proportion of the whole number of shares which the length of the road within the limits of the state should bear to the whole length of such road. The statute was upheld, and in the opinion Mr. Justice FIELD said:

"The state may impose taxes upon the corporation as an entity existing under its laws, as well as upon the capital stock of the corporation or its separate corporate property. And the manner in which its value shall be assessed and the rate of taxation, however arbitrary or capricious, are mere

matters of legislative discretion. It is not for us to suggest in any case that a more equitable mode of assessment or rate of taxation might be adopted than the one prescribed by the legislature of the state; our only concern is with the validity of the tax; all else lies beyond the domain of our jurisdiction." *Delaware Railroad Tax,* 85 U. S. 206, 231.

In 1875, in an opinion by Mr. Justice MILLER, it was held that the entire taxable property of a railroad company could be ascertained by the state board of equalization, and that the state, county, and city taxes could be collected within each municipality on this assessment in the proportion which the length of the road within such municipality bears to the whole length of the road within the state, and it was said:

"It may well be doubted whether any better mode of determining the value of that portion of the track within any one county has been devised than to ascertain the value of the whole road, and apportion the value within the county by its relative length to the whole." *State Railroad Tax Cases,* 92 U. S. 575, 608.

In 1887, in an opinion by Mr. Justice MILLER, a tax on property owned by the Western Union Telegraph Company in Massachusetts was upheld where the proportion of the length of its lines in that state to their entire length throughout the whole country was made the basis for ascertaining the value of the property. *W. U. Tel. Co. v. Massachusetts,* 125 U. S. 530, 552, 8 Sup. Ct. 961.

In this case it was objected that the state officials had failed to make certain necessary deductions. In reply to this objection the court held that they were not called upon to defend all the items and rules by which taxing officials had arrived at the taxable value, on which the ratios of percentage should be assessed, and, "since the principle is one which we cannot pronounce to be an unfair or an unjust one, we do not feel called upon to hold the tax void because we might have adopted a different system had we

been called upon to accomplish the same result." *W. U. Tel. Co. v. Massachusetts,* 125 U. S. 530, 553, 8 Sup. Ct. 961.

This case was approved in *Massachusetts v. W. U. Tel. Co.* 141 U. S. 40, 11 Sup. Ct. 889, and it was there held that the rule adopted to ascertain the value of the capital engaged in the business in Massachusetts on which the tax should be assessed was not unfair and that the details of the method adopted did not exceed the fair range of legislative discretion.

In 1890 a similar question as to the apportionment of the tax of the Pullman's Palace Car Company arose.    In the opinion of the court by Mr. Justice GRAY it was said:

"The mode which the state of Pennsylvania adopted to ascertain the proportion of the company's property upon which it should be taxed in that state was by taking as a basis of assessment such proportion of the capital stock of the company as the number of miles over which it ran cars within the state bore to the whole number of miles, in that and other states, over which its cars were run.    This was a just and equitable method of assessment; and, if it were adopted by all the states through which these cars ran, the company would be assessed upon the whole value of its capital stock, and no more.

"The validity of this mode of apportioning such a tax is sustained by several decisions of this court, in cases which came up from the circuit courts of the United States, and in which, therefore, the jurisdiction of this court extended to the determination of the whole case, and was not limited, as upon writs of error to the state courts, to questions under the constitution and laws of the United States." *Pullman's P. C. Co. v. Pennsylvania,* 141 U. S. 18, 26, 11 Sup. Ct. 876.

In 1891 the same court in two cases approved the track-mileage basis for apportioning the tax on railroads operating in different states.    *Maine v. Grand Trunk R. Co.* 142 U. S. 217, 12 Sup. Ct. 163; *Charlotte, C. & A. R. Co. v. Gibbes,* 142 U. S. 386, 12 Sup. Ct. 255.

In 1893 the same principle was approved in allotting the

tax between different counties in the same state. *Columbus Southern R. Co. v. Wright,* 151 U. S. 470, 14 Sup. Ct. 396. In the same year the same rule was approved in an opinion by Mr. Justice BREWER, assuming that there were no special circumstances existing to distinguish between the conditions in the different states, "such as terminal facilities of enormous value in one and not in the other." *Cleveland, C., C. & St. L. R. Co. v. Backus,* 154 U. S. 439, 14 Sup. Ct. 1122.

The same rule as to apportionment on a mileage basis was approved, and the case of *Pullman's Palace Car Co., supra,* was cited and relied on as an authority, in *W. U. Tel. Co. v. Taggart,* 163 U. S. 1, 16 Sup. Ct. 1054; *American R. T. Co. v. Hall,* 174 U. S. 70, 19 Sup. Ct. 599, and as to express companies in *Adams Exp. Co. v. Ohio,* 165 U. S. 194, 17 Sup. Ct. 305. In this case the court sustained the track-mileage mode of assessment and closed the opinion by saying:

"We have said nothing in relation to the contention that these valuations were excessive. The method of appraisement prescribed by the law was pursued and there were no specific charges of fraud. The general rule is well settled that 'whenever a question of fact is thus submitted to the determination of a special tribunal, its decision creates something more than a mere presumption of fact, and if such determination comes into inquiry before the courts it cannot be overthrown by evidence going only to show that the fact was otherwise than as so found and determined. *Pittsburgh, C., C. & St. L. R. Co. v. Backus,* 154 U. S. 421, 434, 14 Sup. Ct. 1114; *W. U. Tel. Co. v. Taggart,* 163 U. S. 1, 16 Sup. Ct. 1054.' " *Adams Exp. Co. v. Ohio,* 165 U. S. 194, 229, 17 Sup. Ct. 305.

In 1903, in *Fargo v. Hart,* 193 U. S. 490, 24 Sup. Ct. 498, apportionment on the mileage basis was approved, although the assessment was held bad because it appeared that the total valuation was made up of real estate and personal property permanently located in other states and not

necessarily used in the business of the company. In various later cases the supreme court has cited and quoted the *Pullman's P. C. Co. Case, supra,* as to other subjects than that of apportionment by track mileage, and without disapproval of that method.

We have cited and quoted from the foregoing cases quite freely because counsel for defendant claim that they have been overruled by the case of *Union Tank Line Co. v. Wright,* 249 U. S. 275, 39 Sup. Ct. 276. In this case the Union Tank Line Company, a New Jersey corporation, rented its cars to an oil company for use in Georgia, although they were not permanently within that state but passed in and out. Sec. 989, Civil Code of Georgia, provided, in part, that:

"Each nonresident person or company whose sleeping-cars are run in this state shall be taxed as follows: Ascertain the whole number of miles of railroad over which such sleeping-cars are run, and ascertain the entire value of all sleeping-cars of such person or company, then tax such sleeping-cars at the regular tax rate imposed upon the property of this state in the same proportion to the entire value of such sleeping-cars that the length of lines in this state over which such cars are run bears to the length of lines of all railroads over which such sleeping-cars run."

Sec. 990 prescribed that companies owning equipment cars should be taxed in the manner prescribed for sleeping-cars. Sec. 1031 was as follows:

"Railroad companies operating railroads lying partly in this state and partly in other states shall be taxed as to the rolling stock thereof and other personal property appurtenant thereto, and which is not permanently located in any of the states through which said railroads pass, on so much of the whole value of rolling stock and personal property as is proportional to the length of the railroad in this state, without regard to the location of the head office of such railroad companies."

The company made its return as prescribed by the statute, and the case was tried upon pleadings and an agreed state

of facts. Among other things, it was agreed that the comp-troller general of the state had no other information than was contained in the return filed by the company; that he did not ascertain the value of the cars used in the state; that the assessment entered against the property during the period embraced the valuation of about 300 cars in excess of what the company actually had in Georgia during the period; that for the year 1914 the assessment covered the value of at least 350 cars in excess of the number plaintiff had in the state for the time the tax was assessed; " 'that defendant in entering said assessment never undertook to ascertain the actual property of plaintiff located in the state of Georgia during the said years or to assess its prop-erty at its real value for taxation, otherwise than by simply ascertaining the percentage of its entire property shown by the ratio of the railroad traversed by its equipment in Georgia and the railroad mileage traversed by its equipment everywhere as shown by its said return filed on March 16, 1914.' "

The supreme court of Georgia sustained the tax. On writ of error to the United States supreme court, in the opinion by Mr. Justice McReynolds it was said:

"A state may not tax property belonging to a foreign cor-poration which has never come within its borders—to do so under any formula would violate the due-process clause of the Fourteenth amendment. In so far, however, as movables are regularly and habitually used and employed therein, they may be taxed by the state according to their fair value along with other property subject to its jurisdic-tion, although devoted to interstate commerce. While the valuation must be just it need not be limited to mere worth of the articles considered separately, but may include as well 'the intangible value due to what we have called the organic relation of the property in the state to the whole system.' How to appraise them fairly when the tangibles constitute part of a going concern operating in many states often presents grave difficulties; and absolute accuracy is generally impossible. We have accordingly sustained meth-

ods of appraisement producing results approximately correct—for example, the mileage basis in case of a telegraph company (*W. U. Tel. Co. v. Massachusetts,* 125 U. S. 530, 8 Sup. Ct. 961), and the average amount of property habitually brought in and carried out by a car company (*American R. T. Co. v. Hall,* 174 U. S. 70, 19 Sup. Ct. 599). But if the plan pursued is arbitrary and the consequent valuation grossly excessive, it must be condemned because of conflict with the commerce clause, or the Fourteenth amendment, or both. (Citing cases.)

"In the present case the comptroller general made no effort to assess according to real value or otherwise than upon the ratio which miles of railroad in Georgia over which the cars moved bore to total mileage so traversed in all states. Real values—the essential aim—of property within a state cannot be ascertained with even approximate accuracy by such process; the rule adopted has no necessary relation thereto. During a year two or three cars might pass over every mile of railroad in one state while hundreds constantly employed in another moved over lines of less total length. Fifty-seven was the average number of cars within Georgia during 1913 and each had a 'true' value of $830. Thus the total there subject to taxation amounted to $47,310—the challenged assessment specified $291,196.

"We think plaintiff in error's property was appraised according to an arbitrary method which produced results wholly unreasonable, and that to permit enforcement of the proposed tax would deprive it of property without due process of law and also unduly burden interstate commerce." *Union Tank Line Co. v. Wright,* 249 U. S. 275, 282, 39 Sup. Ct. 276.

The opinion then discusses the case of *Pullman's Palace Car Company* and holds that the reasonableness of the rule as to apportionment was not in question in that case and that what was said on that subject was *obiter.*

Mr. Justice DAY, in view of the undisputed facts, concurred in the result, and Mr. Justice PITNEY, with whom concurred Mr. Justice BRANDEIS and Mr. Justice CLARKE, dissented.

It is obvious that a very different situation is presented in the instant case. In the other case the sole method of apportionment prescribed by the Georgia statute was on the track-mileage basis. The comptroller general in that case made no attempt to assess the property at its true value except on that basis. By the Wisconsin statute the commission was required to take into consideration "the value of the entire system and of that part thereof within this state, the earning capacity of the entire system and of that part within this state, its entire mileage and the mileage within this state, the car mileage of the entire system and the car mileage within this state, and such other information, facts, and circumstances as will aid the commission to make a substantially just and correct determination of the valuation of so much of said property as is subject to taxation in this state." Sec. 51.42, Stats. 1913.

The record shows that the commission in their computations and estimates made use not only of the track-mileage but the car-mileage system. The company made no return of its net earnings in Wisconsin, but on request did furnish a report of its gross earnings in the state for certain periods, which furnished some guide as to the earnings for the year. The tax commission had before it much other information which under the statute it had the right to use. As appears in the statement of facts, there were very wide differences in the estimates of the values of the sleeping-car business in Wisconsin, depending upon the different methods used to obtain the unit value of the entire sleeping-car business. None of these results correspond with the sum $1,900,000, the amount held liable to be taxed in Wisconsin. This demonstrates that the commission followed no arbitrary or cast-iron rule in making the apportionment, but that they took into consideration all the material facts authorized by the statute, and exercised their best judgment in arriving at the result.

We do not interpret the decision in the *Union Tank Line*

State v. Pullman Co. 178 Wis. 240.

*Case* as overruling the long line of cases in the federal and state courts extending through so many years and determining property rights of such vast importance. We rather construe it as declining to approve the track-mileage method in a case where its application would, under the facts, work great injustice. There is language in the opinion from which it might be inferred that the plan would not be condemned unless arbitrary, causing excessive taxation. By such a construction the case would be more nearly in harmony with that of *Fargo v. Hart,* 193 U. S. 490, 24 Sup. Ct. 498; *Pittsburgh, C., C. & St. L. R. Co. v. Backus,* 154 U. S. 421, 14 Sup. Ct. 1114, and *Wallace v. Hines,* 253 U. S. 66, 40 Sup. Ct. 435, where, by reason of special circumstances, the rule was held not applicable.

A corporation like the defendant, carrying on a great business and having property in every state and in foreign countries, like an individual should bear its fair burden of taxation for the protection it receives. When the magnitude of such a corporation, and the complications of its internal management, increase, the processes of administering the laws become correspondingly difficult, but that must not stay the hands of the taxing power.

Some general system must be adopted by every state. Even if the system is not perfect, it is better than none at all. It is better that there should be honest mistakes in administering an imperfect law than that there should be no guide but the caprice of the assessor. For nearly fifty years the general plan of apportioning taxes on corporations' doing business in several states on a method used by the commission in this case has been followed and approved by the courts.

In examining the very able brief of counsel for the defendant and in examining many cases, we have found no suggestion of a better plan than the general scheme prescribed by the Wisconsin statute and followed as nearly as possible by the commission.

State v. Pullman Co. 178 Wis. 240.

Defendant's counsel argue that even if the rule so long recognized by the federal and state courts has not been overruled, it cannot be here applied because the special circumstances distinguish this from other cases. One of the special circumstances is the claim that defendant's cars were assigned to independent railroads under separate contracts for exclusive use on certain lines and that the different lines had no functional connection except that of ownership. Our reasons for believing this argument fallacious have been already stated, and we cannot accept it.

As another special circumstance defendant's counsel urge that 28 per cent. of the cars used everywhere were of steel construction while only 16.62 per cent. of those touching Wisconsin were steel. Counsel for the state argue that this is not the only fact material to be considered, but that if the number of miles run in Wisconsin by the steel cars were taken into account and if defendant had offered proof on that subject, it would have appeared that Wisconsin's proportion of miles run of steel cars would have exceeded twenty-eight per cent., the proportion it was entitled to if the steel and wooden cars had been equally apportioned everywhere. The proof was that the same rates were charged on the wooden as the steel cars. They were not assessed as separate articles, but for their tangible and intangible value as part of a single system.

There is another "special circumstance" which defendant's counsel claim should distinguish the case from others which have been cited, even if the general plan of apportionment that was used should be sustained; namely, that the earnings in some other states per car mile were greater than in Wisconsin. It appeared from the testimony that the average earnings per car mile on lines which touched Wisconsin were about seventy-eight per cent. of the average everywhere. There was no testimony as to the earnings in Wisconsin as compared with the average earnings of all cars, and we think there is force in the argument of counsel

for the state that the earnings per car mile on lines touching Wisconsin is not a fair criterion of the earnings per car mile on lines in Wisconsin. There were undoubtedly far greater earnings per car mile from cars of defendant running from New York to Buffalo than from those running from Madison to Superior. On the other hand, the company received far less earnings from its cars between corresponding points in some parts of the West and South.

There was the same kind of disparity in earnings of the Western Union Telegraph Company between points thickly settled and those thinly settled. But in the various cases which have come before the courts this does not seem to have been a ground for rejecting the well settled rule of apportionment on a mileage basis for purposes of taxation. The company had no such "enormous terminals" in other states as are mentioned in *Pittsburgh, C., C. & St. L. R. Co. v. Backus, supra.* It had no terminals whatever. It had constructed no roadbed at a far greater expense in one state than another, as in *Wallace v. Hines,* 253 U. S. 66, 40 Sup. Ct. 435. Nor had the commission failed to deduct, as in that case, a large amount of personal property not used in the business. We do not consider that any of such "special circumstances" were proved as render improper or illegal the mode of apportionment adopted by the commission.

It was claimed in the oral argument of defendant's counsel that the commission erred in arriving at the value of the property on the stock-and-bond basis by omitting to deduct certain treasury stock. The subject is also mentioned, but not discussed, in their brief. It is very briefly discussed in the brief of counsel for the state.

There were 21,375 shares which had been sold by the company and afterwards bought back at the market price and then placed in the treasury. They had not been canceled, and the company received the same dividends upon them as other shareholders. We have found no authorities and none have been cited bearing on the precise question

whether the commission should have ignored these facts in making their valuation. These shares were of course assets belonging to the company. They could have been sold at the market price. The proceeds could have been invested in equipment for the company which would have been personal property used in the business. If the company for a long course of years, from its earnings or the sale of other property, had acted on the settled policy of buying its own stock and naming it treasury stock, would that have affected the right of the state to tax the property of the company at its true value?

The deduction to be made under the statute was "its personal property not used in its business." We are not disposed to hold that under the circumstances this treasury stock was not connected with or used in the business of defendant. If, instead of its treasury stock purchased and held as this was, the company had bought and held 'bonds or stocks in entirely different concerns, another quite different question would be presented.

Even if there was the error claimed it does not necessarily follow that the whole assessment was invalidated. The fact that these shares were in the treasury of the company in no way affected the capitalization of net earnings, which were the same whoever owned the stock. As appears from Table 23 (see p. 253), the proportionate valuations of the sleeping-car business assigned to Wisconsin on the plan of capitalization of net earnings varied from $1,798,229 to $2,081,165. From the testimony it is apparent that this plan was much relied on by the commission, as it had been by other commissions and courts.

If the lesser number of shares had been used instead of 1,200,000, it would have varied by some thousands of dollars the figures on Exhibit 23 under the stock-and-bond valuation, but this was only one factor under consideration. It is not probable that it would have influenced the commission in concluding that the proper amount for taxation in

Wisconsin was $1,800,000. Since the argument a statement in the form of a short supplemental brief has been presented by counsel for the state showing that the greatest amount that the figures on the stock-and-bond valuation could have been increased by including the 21,375 shares in the company's treasury was $43,407, varying from that to $24,490, depending on the value of the shares, and other data used in the table. This is an inconsiderable amount in view of the fact that the commission was dealing with valuations ranging from $1,300,000 to $2,300,000, and in view of the fact that there would be apportioned to Wisconsin only 1.376 % or 1.467 % of the amount whatever it might be, and that the result would be multiplied by .0118324, the average rate of taxation, state and local, for Wisconsin at that time.

The trial judge prepared and filed a very able and helpful opinion, and we agree with his conclusions except in one particular: that which relates to the value to be deducted for real estate outside Wisconsin.

The company reported as the actual value of such property $3,476,065.58, and this amount was deducted in determining the unit value. Sec. 51.39 required the commission to deduct the "actual value of all its real estate situate without this state." It is claimed by defendant's counsel that there should have been deducted not only the amount reported as the book value of the real estate, but something for intangible value connected with it, and that the trial court was obviously right; but the proposition is not argued in their brief.

It is the rule in Wisconsin, well settled by decisions of this court, that in the valuation of property having both tangible and intangible value there should be no attempt to separate the two elements. In an opinion by Mr. Justice MARSHALL, construing a statute for the taxing of railroads, it was said:

"The statute does not contemplate that franchises of any sort of corporations, private or public, or good will, or

prospects in business, or any such matters shall be considered by the assessor and valued as separate elements; that any definite sum shall be added to the value of the physical things on account thereof. It only contemplates valuation of such physical things under the circumstances of each particular case. The value of the physical elements of corporations, or business property, is made up largely of those which are invisible. . . .

"The statute does not require any such procedure as the appraisal of physical property separately from the other elements, and judicial policy condemns it. . . . There can be no separation of tangible and intangible elements which will furnish any legitimate basis for the valuation of one or the other. . . . Neither, strictly speaking, is required to be valued, but only the thing which the two in combination make. . . ." *Chicago & N. W. R. Co. v. State,* 128 Wis. 553, 617, 621, 622, 108 N. W. 557; *Appleton W. W. Co. v. Railroad Comm.* 154 Wis. 121, 142 N. W. 276.

In the present case there was no requirement in the statute that the commission should divide or separate the tangible from the intangible values and they made no attempt to do so. Since the statute requires that the "actual value" of defendant's real estate outside the state be deducted, it is very doubtful whether after such segregation it had any intangible value. No authorities are cited in either brief applying to such a situation or which might be a guide in the attempt to ascertain the intangible value, if any, of the real estate. There might be unlimited speculation as to the proper amount to be deducted for the intangible value of this real estate, if it had any, but we are unable to see how, on any theory, such a deduction could have reduced the final assessment, except in a very small amount.

Counsel for the state argue in this connection that there are other facts which show that if there was any error in failing to make deductions for the treasury stock or intangible value of the real estate, there was no loss to the company, since for other reasons the assessment was too low. The value of real estate as carried on the books of the company

State v. Pullman Co. 178 Wis. 240.

was $482,501.17 less than the amount reported and allowed by the commission.

The defendant reported its total track mileage everywhere to the Wisconsin commission as about 50,000 miles more than was reported to the interstate commerce commission. There was also a large discrepancy in the car mileage between the reports to the two commissions. Some, but not all, of these mistakes were explained in the testimony, and we cannot say that they did not materially affect the computations to defendant's advantage, as claimed by counsel for the state.

Such facts as these and others contained in the voluminous record illustrate the magnitude of the task which confronted the commission in making the assessment. We have already cited and quoted from cases which mention not only the difficulty but also the impossibility of perfect accuracy in such an undertaking. The cases already cited show that such finding of a commission will not be set aside by the court because the court might have decided differently on the facts, but only because of the adoption of a fundamentally wrong principle which has caused excessive and unjust taxation.

We have discussed at perhaps undue length the questions most emphasized in the arguments and briefs of counsel. Objections were made that the sections of the statute involved are unconstitutional for the reasons that they permit the taking of property without due process of law and that they seek to delegate legislative power to the commission. We think that these objections are sufficiently covered by the foregoing discussion and the long line of decisions cited in which statutes differing in detail but similar in principle have been sustained.

The objection is also made that the statute violates the constitutional rule as to uniformity of taxation. This objection is well answered in the decision of the trial court, as follows:

State v. Pullman Co. 178 Wis. 240.

"The purpose of the provision of the state constitution requiring the rule of taxation to be uniform is to secure uniformity of burden. 'The constitutional rule looks, as it were, always to the object to be attained, not necessarily to the mere means or manner of reaching it.' *Chicago & N. W. R. Co. v. State,* 128 Wis. 553, 613, 614, 108 N. W. 557. Uniformity of burden depends on uniformity of rate and uniformity of assessment. It is suggested that the method of taxation prescribed in the statutes here under consideration violates the rule of uniformity, because sleepers owned and operated by certain railroads in Wisconsin are assessed as a part of their general property and not under the provisions of these sections. But the statutes require all property of railway companies to be valued for assessment on the same basis as the general property of the state, which is required to be assessed at its actual cash value. These statutes likewise require the property of the defendant to be assessed at its actual cash value. The statutes further require the rate of taxation upon the property of the defendant and of the railway companies of the state to be the average rate of taxation for the entire state. Thus it is seen that the rule of taxation is uniform, being determined in each case by the application of the same rate to the actual cash value of the property taxed. The fact that different methods may be used in fixing the actual cash value of the property in each case does not violate the rule as to uniformity."

It is our conclusion that neither the statutes in question nor the methods pursued by the commission were in violation of any of the provisions of the state or federal constitution; that the assessment made by the commission was not excessive or unjust; and that it should be sustained.

*By the Court.*—The judgment is reversed, and the cause remanded to the circuit court with direction to enter judgment in favor of plaintiff and against defendant according to the prayer of the complaint.

A motion for a rehearing was denied, with $25 costs, on October 10, 1922.