WISCONSIN GAS & ELECTRIC COMPANY, Appellant, vs. TAX
COMMISSION and others, Respondents. [Two cases.]
THE MILWAUKEE ELECTRIC RAILWAY & LIGHT COMPANY,
Appellant, vs. SAME, Respondents. [Two cases.]

*February 7—June 2, 1936.*

488

For the appellants there were briefs by *Shaw, Muskat & Paulsen,* and oral argument by *James D. Shaw* and *Van B. Wake,* all of Milwaukee.

The *Attorney General, W. L. Gold* of Milwaukee, special counsel, and *W. G. Sullivan* of Milwaukee of counsel, for the respondents.

The following opinion was filed March 31, 1936:

WICKHEM, J. It is very difficult within the compass of a useful judicial opinion to state the facts and adequately discuss the various questions presented to the court upon this appeal. Some idea of the difficulty will be had when it is stated that the several volumes of the printed case total one thousand seven hundred fifty-five pages and that there are six hundred eighty-seven pages of briefs.

The plaintiffs are public utility companies, and their property is assessed under ch. 76, Stats., by the Tax Commission. Sec. 76.07 (1), Stats. 1931, requires the Tax Commission on or before the 1st day of July in each year, "according to their best knowledge and judgment," to "ascertain and determine the full market value of the property of each company within the state." Sec. 76.07 (2) provides:

"The value of the property of each of said companies for assessment shall be made on the same basis and for the same period of time, as near as may be, as the value of the general property of the state is ascertained and determined."

Sec. 76.03 prescribes in sub. (1):

"The property, both real and personal, including all rights, franchises and privileges used in and necessary to the prosecution of the business of any company enumerated in sec. 76.02

shall be deemed personal property for the purposes of taxation, and shall be valued and assessed together as a unit."

Sec. 76.08, Stats. 1931, provides, in substance, that after the assessments have been determined as provided in sec. 76.07, the commission shall continue in session from day to day for such period as may be necessary, not later than the 1st of September, for the purposes of reviewing the valuation and assessment theretofore made. It is further provided that any company whose property has been assessed shall have the right to appeal and to be heard as to the assessment of the property of such company. The commission, on such an application or on its own motion, may correct the assessment in such a manner "as will, in its judgment, make the valuation thereof just and relatively equal with the valuation of the general property of the state."

Having completed the assessment of utilities in accordance with the directions of ch. 76, the Tax Commission then computes the rate of taxation applicable thereto by applying an equalization process prescribed by secs. 76.10 and 76.12, Stats. Since no questions applicable to this equalization process are here involved, it is unnecessary to do more than state that the use of this process results in a lower tax rate applicable to utilities than the average local rate throughout the state, for the reason that local assessments are on the average somewhat lower than the full value of the property assessed. Thus, this case does not involve an examination or inquiry into the assessment of other properties within the state for purposes of comparison as would be the case if the rate were to vary according to the assessment.

Sec. 76.18, Stats. 1931, provides:

"The proceedings of the commission shall be presumed to be regular and the determination of the commission shall not be impaired, vitiated or set aside upon any grounds not affecting the substantial justice of the tax. . . ."

Sec. 76.19, Stats. 1931, prohibits the issuing of any injunction, order, or writ to restrain payment or collection of taxes unless the company seeking this relief shall pay to the state treasurer for the use of the state "the amount of taxes which the court shall determine primarily to be justly and equitably due from such company."

Sec. 76.20, Stats. 1931, provides:

"Any company defined in sec. 76.02 claiming to be aggrieved by the levy of a tax upon its property, and alleging facts showing substantial injustice in the determination of the commission, may within six months from the payment of the tax, not thereafter, bring and maintain an action against the state in the circuit court of the state to recover such part of the tax as shall exceed the amount the company should have paid. . . . "

In this case, each plaintiff asked for a primary determination of the amount of tax pursuant to sec. 76.19, Stats. 1931, and a permanent injunction restraining defendants from levying or collecting any sums in excess of that amount, but thereafter stipulated, without prejudice to its rights, to allow the trial court to enter a temporary order for the full amount of the tax upon the assessment complained of. This amount was thereafter paid into the state treasury. Thus, the question is whether plaintiffs established facts upon the trial showing substantial injustice in the determination of the Tax Commission. The combined effect of secs. 76.19 and 76.20, is to require the circuit court to determine primarily the amount of tax justly and equitably due from each company, and to give judgment for the plaintiffs for any excess over this amount if substantial injustice in the determination of the Tax Commission is found. Since the plaintiffs object to what they claim is an overassessment of the value of their property, and since, after an examination *de novo* of the facts relative to plaintiffs' property, the trial court has sustained the assessment, the question before this court is whether there

is evidence to sustain the findings of the trial court and the presumptively valid assessment by the Tax Commission.

At the outset, it should be clearly understood that the calls of the statute are for the application to the facts by the commission of "their best knowledge and judgment." Applying such knowledge and judgment, the commission is required to find the full market value of the property of plaintiffs. No other standards are set by the statute, no particular method or basis of assessment or appraisal is specified or preferred to any other, and the determination of the commission is not required to be arrived at by the application of any set formula or method.

In *Chicago & N. W. R. Co. v. State,* 128 Wis. 553, 108 N. W. 557, a case involving the *ad valorem* assessment of a railroad company, the court stated:

"To our minds the only reasonable inference is that the board, from all the evidence before it, performed the duty that it was required to perform. . . . The board considered the report of the person who, as before suggested, performed the feat of separating and valuing the physical property, the market price as to each company of its bonds and stocks for a period of five years, reports of the engineers of the railway companies as to the physical property, the gross and net earnings of each company, both in the whole and in this state, and other elements, and fixed the value of the entire property of each company in this state at its due proportion of the value of the entire system, not giving to any particular factor of the evidence any particular weight separate from the other, nor placing any particular value upon any particular element of the property separate from the rest. We see no infirmity in that in any respect."

In *State v. Pullman Co.* 178 Wis. 240, 189 N. W. 543, also dealing with *ad valorem* assessment of a public service corporation, the court said:

"We have already cited and quoted from cases which mention, not only the difficulty but also the impossibility of perfect accuracy in such an undertaking. The cases already cited

show that such finding of a commission will not be set aside by the court because the court might have decided differently on the facts, but only because of the adoption of a fundamentally wrong principle which has caused excessive and unjust taxation."

In *Chicago, B. & Q. Ry. Co. v. Babcock,* 204 U. S. 585, 27 Sup. Ct. 326, Mr. Justice HOLMES stated, with reference to the character of the judgment involved in such matters as we are here concerned with:

". . . They express an intuition of experience which outruns analysis and sums up many unnamed and tangled impressions; impressions which may lie beneath consciousness without losing their worth. The board was created for the purpose of using its judgment and its knowledge."

With reference to a valuation of the public service commission for condemnation purposes, this court, in *Oshkosh W. W. Co. v. Railroad Comm.* 161 Wis. 122, 152 N. W. 859, said:

"It is because the valuation of a utility cannot be reduced to absolutely fixed rules, or to the mere appraisal of parts whose sum equals its value, that the subject is one upon which honest and competent men differ. In the last analysis it is the exercise of a sound and competent business judgment upon many elements of uncertain and debatable value considered as a business entity. Hence grave errors in arriving at and seriously affecting the final result must be shown before a valuation of the commission can be set aside."

It follows that the review of such an assessment as is here involved is a review of the commission's judgment, a judgment which is presumably correct and not subject to being overthrown except by evidence clearly showing that it was exercised upon some gravely erroneous basis. Since the members of the commission are not subject to cross-examination as to the operation of their mental processes in arriving at an assessment (in connection with which see *Chicago, B. & Q.*

*Ry. Co. v. Babcock, supra,* and *Appleton Water Works Co. v. Railroad Comm.* 154 Wis. 121, 142 N. W. 476), the review must necessarily consist of a rationalization of the assessment by application to the facts of standard and approved methods of valuing such properties. If, by the application of such methods to the facts, the assessment is shown to be grossly excessive because substantially out of line with all of them, after allowing a reasonable margin for the exercise of judgment, the tax collected upon the excess must be held to have been inequitably and unjustly levied. The task of ascertaining with anything more than approximate accuracy the full market value of the property of large public service corporations is extremely difficult and probably impossible. The property of such a corporation, due to its size and other peculiar incidents, is not bought and sold under such conditions as will establish its market value, and thus assessing bodies have not the benefit of data which is usable in connection with smaller units of property. As a substitute for ordinary methods of ascertaining value, at least two methods are recognized as having a bearing on value.

The first is that of capitalizing the net income of the utility on the assumption that the value of its property is reflected in its net income and may be ascertained by capitalizing the income at a rate per cent which represents the rate of return currently demanded by investors for the use of money. Another is the stock-and-bond method. This involves the ascertainment of the total market price of the securities of the company, and is founded on the theory that the aggregate market value of all of the company's stocks, bonds, and other securities fairly represents an apprisal by the investing public as to the value of the property of the company. In addition, two other methods are suggested by plaintiffs to have important bearing on value. One is to ascertain the book value of the company's property minus a proper sum for de-

preciation, and then to add to this depreciated book value the current assets and the intangible values attributable to its franchises or incidental to a going business. Another is to consider the values upon which the company is permitted to earn rates. No question is here raised as to the propriety of using either or both of the first two methods, and certainly no claim can successfully be made that the commission must consistently adopt one of these four methods to the exclusion of the others. *Great Northern Ry. v. Weeks,* 297 U. S. 135, 56 Sup. Ct. 426.

The claims are, first, that the evidence shows definitely the erroneous and improper use of each of these methods by the commission; and, second, that the proper use of these methods demonstrates the incorrectness and grossly excessive character of the assessment. The foregoing will be enough to give a preliminary understanding of the questions involved.

It will now be convenient further to state the facts concerning these utilities.

The Milwaukee Company is a wholly owned subsidiary of the North American Company; the only shares of stock outstanding that are not owned by the holding company being qualifying shares. This company serves a territory which as of December 31, 1932, had an estimated population of 1,377,700. It owns four hundred miles of railroad track, operates an urban and suburban street railway system in Milwaukee and suburbs. It owns and operates interurban lines to several cities outside of Milwaukee. It has five power plants and also leases from the Wisconsin Electric Power Company a large plant known as the Lakeside plant. This plant generates forty per cent of all the electrical current in the state. This plaintiff owns several steel transmission lines, one of which runs as far north as the city of Appleton and connects with the transmission line of the Wisconsin Michigan Power Company, from whom it purchases hydrogenerated current.

It operates a heating utility in the city of Milwaukee, and furnishes electrical service throughout Milwaukee county.

The Wisconsin Gas & Electric Company serves one hundred eighty-eight communities in fourteen counties of this state. The population served estimated as of the year ending December 31, 1932, was three hundred · seventy thousand people. It has seven gas plants, and distributes through high-pressure mains to Kenosha, Racine, South Milwaukee, Waukesha, Watertown, Fort Atkinson, Oconomowoc, and other communities. It supplies electricity to Kenosha, Racine, Waukesha, Watertown, Fort Atkinson, Whitewater, West Bend, and other places. The common stock of this plaintiff is owned by the North American Company.

The court will take judicial notice of the fact that each of these companies operates in an unusually prosperous territory. Without going into detail, it is in evidence that these companies have expanded during the last fifteen years and that their record of dividends paid on the common stock has been unusually good even during the period of the depression. The following table shows the dividends on common stock paid by each plaintiff during the years 1927-1932, inclusive:

| | Milwaukee Company | Wisconsin Company |
|------|-------------------|-------------------|
| 1927 | 9.29% | 9.29% |
| 1928 | 10. | 12. |
| 1929 | 12. | 12.1 |
| 1930 | 12. | 12. |
| 1931 | 10. | 12. |
| 1932 | 2.5 | 9.25 |

The financial structure of each company is sound; the interest on the funded debt of each being five per cent. The earliest maturity on funded debt of the Milwaukee Company is 1961. The earliest maturity on the funded debt of the Wisconsin Company is 1952. These are factors which have no decisive weight standing alone, but which the commission

was entitled to take into account in forming a judgment as to the market value of the properties of these plaintiffs.

The assessments of the two plaintiffs for the years in question are as follows:

| | Milwaukee Company | Wisconsin Company |
|---|---|---|
| 1932 | $144,000,000 | $27,000,000 |
| 1933 | 136,000,000 | 26,500,000 |

Without further preliminaries, we shall proceed to an examination of the contention that the method of capitalizing operating income was erroneously applied by the commission.

The commission is charged with error in two respects: First, the application to the determined income of an unreasonably low rate of capitalization; second, the inclusion in net income of items properly classified as operating expenses. The first error is claimed to have converted the net operating income of the company into a grossly high valuation of the property; the second, assuming the validity of the rate used, is claimed to have resulted in the application of the rate to a grossly excessive income.

The first question relates to the proper rate of capitalization. Since the considerations are identical with respect to each plaintiff, the question may be discussed without particular reference to either. Plaintiffs claim that the proper rates of capitalization are seven, seven and one-half, and eight per cent, while the defendants in testing the validity of the commission's assessment have insisted upon the propriety of rates of five, five and one-half, and six per cent. We assume that the rate at which the earnings of a company are capitalized must bear a relation to the rate of return currently being derived from capital invested in other taxable property. The rate is largely a matter of judgment. In approving the use of six per cent as a proper rate of capitalization during what perhaps may be described as more normal times, this court

said, in *State v. Pullman Co.* 178 Wis. 240, at page 261, 189 N. W. 543:

"The subject involved the consideration of current rates of interest, the financial condition of the company, and general economic and financial conditions, all of which were subjects peculiarly within the province of the tax commission."

The following cases approve the use of the six per cent rate during normal times: *Louisville & N. R. Co. v. Greene,* 244 U. S. 522, 37 Sup. Ct. 683, 692; *Illinois Cent. R. R. Co. v. Greene,* 244 U. S. 555, 37 Sup. Ct. 697, 700; *Louisville & N. R. Co. v. Coulter* (C. C.), 131 Fed. 282, 303; *Pleasant v. Mo.-Kan.-Tex. R. Co.* (C. C. A.) 60 Fed. (2d) 842; *Great Northern Ry. v. Weeks,* 297 U. S. 135, 56 Sup. Ct. 426.

If it is proper to apply a rate of six per cent in normal times, it seems to us that the use of a lower rate for valuation purposes is entirely proper in times of financial depression. While it may seem anomalous to use the lower rate in times of depression with a resultant higher valuation of the property, a closer analysis indicates its fairness. Property of substantially the same value will earn a higher rate of return in good times and a lower rate in bad times. Capitalization at current rates of return will reflect the essentially equal value of the property during these years, and this is substantially sound, other factors being equal. The evidence sustains the conclusion of the trial court as to the proper rate of capitalization. At least it cannot be said that six per cent is too low, and we seriously question whether a rate of five per cent could be disturbed. During 1931, the Milwaukee Company was able to refund the balance of its funded debt at five per cent, and the Wisconsin Company to convert its six and one-half and seven per cent preferred stock to a six per cent basis. On September 15, 1932, the representative of plaintiffs testified in a rate hearing that the rate of return ought to be five

per cent. In view of the fact that a six per cent rate applied to what we consider to be a properly adjusted net income sustains the assessment, we do not find it necessary to determine whether a lower rate would be proper.

It now becomes necessary to consider certain items of disputed adjustments affecting the total net income. It will not be necessary to consider separately the claims of plaintiffs, since the same question is involved in each case. For the purposes of illustration and discussion, we shall consider the claims of the Milwaukee Company.

The commission added numerous items to the net operating income of the Milwaukee Company as reported, and objection is made to these. Since the assessments of the Milwaukee Company are sustained when its operating income is capitalized at the rate of six per cent and adjusted exactly as this plaintiff claims, provided its right to extra depreciation be disallowed, we limit our consideration to that item.

The amounts claimed for additional depreciation after deducting interest on reserve balances are as follows:

| | The Milwaukee Company. | | |
|---|---|---|---|
| 1929 | 1930 | 1931 | 1932 |
| $2,534,610 | 2,720,511 | 3,387,501 | 3,069,597 |

These amounts are not set up as depreciation on the books of the Milwaukee Company. The three-year average of these amounts is $2,880,874 for the year 1932, and $3,059,527 for the year 1933. These sums, capitalized at six per cent, would run into amounts from forty-eight to fifty million dollars, and if erroneously added to the operating income would result in a grossly excessive valuation. The commission took the position that the amount of depreciation to which plaintiffs were entitled was that claimed on their books, and this amount they were permitted to charge as operating expenses. The Milwaukee Company claimed the right to translate the depreciation as claimed on the books, which was on a sinking-

fund basis, into the so-called straight-line method of charging depreciation.

The subject of depreciation presents many difficulties. A company with a million dollars worth of property appropriate for the operation of a public service corporation owns thousands of different items of property, each one of which may have a different period of longevity. Each day that the company operates, there is wear and tear on its property, not made good by ordinary expenditures for repair and maintenance. The useful life of some items of property is ended; that of others impaired. Obviously, the company must be permitted to earn a rate which will give a fair return to the investor without destroying the integrity of the investment. Equally obviously, an *ad valorem* tax assessment must take account of the diminution in value caused by time, wear, and tear. A company may currently replace and charge to operating expenses such items of property as have come to the end of their useful life, and may charge these as operating expenses during the years in which replacements occur. In a sense, this method tends accurately to reflect annual loss, for the reason that loss on property which has depreciated but is still used and useful does not actually accrue until the necessity for replacement arises. It does not, however, take into account the fact that the aged items, even though used and useful, are from every standpoint less valuable than when new. Nor does it furnish a basis upon which the company may earn sufficient rates to accumulate a reserve for replacing the physical property.

Out of these considerations arises the practice of charging annually as a part of the operating expenses a certain determined percentage considered to approximate the annual impairment of the investment and to permit the company to earn such a rate as will build a sufficient reserve for the replacement of its property at the end of its useful life.

In *Lindheimer v. Illinois Tel. Co.* 292 U. S. 151, 54 Sup. Ct. 658, the court said, with reference to depreciation charges:

"The calculations are mathematical but the predictions underlying them are essentially matters of opinion. They proceed from studies of the 'behavior of large groups' of items. These studies are beset with a host of perplexing problems. Their determination involves the examination of many variable elements, and opportunities for excessive allowances, even under a correct system of accounting, are always present."

The foundation for depreciation charges and reserves is a study of the items of property subject to depreciation. It is unnecessary to attempt in this opinion a detailed explanation of the process or method by which a general rate of depreciation applicable to an entire property consisting of a multitude of items of different longevity is arrived at. It suffices to say that, when it is properly arrived at, the rate of depreciation at least indicates the amount of earnings that must be set aside to preserve the integrity of the investment as a whole. At best, it is a rough approximation of the actual annual depreciation.

In the first place, the ultimate rate is only arrived at by taking some sort of an average of the lives of thousands of different items of property. As applied to any single item of property, the general rate will only accidentally, if at all, reflect its rate of annual or ultimate depreciation. However, if it is sufficient to preserve the integrity of the property as a whole and to serve as a basis of rate making and credit, there seems to be no reason why it should not be considered to have a bearing upon annual depreciation when the value of the property for purposes of taxation is in question. We do not understand that this is disputed by plaintiffs. It is rather their contention that the added depreciation claimed in this case, over and above that charged on plaintiff's books, results from an attempt on plaintiff's part to translate its method of

setting up depreciation by the sinking-fund method into the so-called straight-line method of depreciation, and that the straight-line method more accurately measures annual depreciation than does the sinking-fund method. In the straight-line method of charging depreciation, the cost of the article depreciated is divided by the number of years of its predicted life usefulness, and the percentage thus arrived at charged as depreciation each year.

The sinking-fund method used in its books by plaintiff Milwaukee Company arrives at the same result in a different way. Since at the beginning of a period to which the rate of depreciation is applicable there presumably will not be the cost for replacement that will accrue toward the end of the period, a smaller rate of depreciation is set up, and by crediting to the depreciation fund interest on the sums set apart for depreciation, these smaller percentages plus interest will ultimately replace the property without impairing the investment.

The larger figures for depreciation claimed by plaintiff are the result of translating the 2.83 percentage charged on the sinking-fund method into a percentage of 4.25, which is the equivalent under the straight-line method. The fallacy of plaintiff's argument has already been pointed out. Neither method is a theoretically accurate means of expressing annual depreciation. The straight-line method in actual probative force is not superior to the sinking-fund method. It appears that the commission allowed as a deduction from the operating income the interest on reserve balances. Without expressing any opinion as to the propriety of this allowance, it is plain that, so long as this item is credited to plaintiff as additional depreciation deductible from operating income, plaintiff has no legitimate complaint. The commission accepted the method and percentage of depreciation set up by plaintiff's books, used by it as a basis of rates and credit, and to sustain plaintiff's contention would require that all ac-

counting systems of estimating depreciation be discarded for the purpose of *ad valorem* assessments and annual or at least frequent surveys made by the commission of the physical condition of the properties. It is not apparent to us that such a practice would produce superior results. We see no reason why the Tax Commission may not accept whatever method of depreciation is regarded by the utility as sufficient to maintain its investment and which the evidence shows actually does maintain its investment as having a bearing upon actual annual depreciation. Taken over a period of years, this will produce equitable although not perfect results. If it is a satisfactory basis for dealing with investors, creditors, and rate-making bodies, we see no reason why it may not be given weight by a tax commission as a factor to be considered in connection with the capitalization method.

The evidence in this case shows that, with the depreciation now charged, the physical plant of the plaintiff Milwaukee Company has in fact maintained its integrity. In 1914, when appraised by a public service commission engineer, the property was found to be in an eighty-five per cent condition. In 1930, plaintiff's accountant, testifying in a fare case, stated .that the property was in better than an eighty-five per cent condition. In view of this and the further. fact that the company has operated upon a high standard of maintenance, it cannot be concluded that the depreciation was inadequate.

In view of these considerations, it is our conclusion that the commission properly added to operating income the sums heretofore set forth and claimed as additional depreciation by the plaintiff Milwaukee Company.

With this addition to the Milwaukee Company's income and adjusting all other disputed items favorably to the company, the value of the Milwaukee Company property capitalized at six per cent would be $150,840,617 in 1932, as against an assessment of $144,000,000, and $136,825,450 in

1933, as compared to an assessment of $136,000,000. In view of this, we do not consider it necessary or profitable to consider the propriety of other additions to operating income objected to by the Milwaukee Company. If it were to be found that plaintiff Milwaukee Company was entitled to have deducted none of these items, the valuation by the capitalization method would be much in excess of the assessment. Hence, it is our conclusion that a consideration of the capitalization method fails to disclose any grave error resulting in an unjust tax to plaintiff. As has heretofore been said, we consider that the same general considerations are applicable to the Wisconsin Company, and that no useful purpose would be served by an examination into the details of its claims.

It is next contended by plaintiffs that, tested by the stock-and-bond method, the property of plaintiffs is grossly over-valued. The principles involved apply equally to the claims of each plaintiff, and the illustrations and discussion will be based on facts relative to the Milwaukee Company.

Upon the 1932 assessment, the aggregate value of the securities of the Milwaukee Company, according to the commission, was $191,440,890, as against an assessment of $144,000,000. On the 1933 assessment, the total value of the securities as estimated by the commission was $153,038,636, as against an assessment of $136,000,000. The attack upon the commission's figures in this respect centers about the fact that the commission adopted a three-year average method of arriving at the value of the property. Plaintiff's contention that a three-year average of market value is improper cannot be sustained. More frequently, the courts have authorized a five-year average. It is clear that security values on any day or during several months of the year of the assessment are not fair measures of the value of the property, especially during depression years when such figures testify to the demoralization of the stock market and the general economic

structure rather than to value. If such figures could fairly be used, it could easily be established that such properties were of little or no value.

For example, it is a well-known fact that several large companies, out of their cash reserves, could have purchased all of their outstanding stock and securities, provided holders would be willing to sell at the listed price. The disorganization of the economic system was so great that, standing alone, market prices during the depression are not a satisfactory indication of value, and, in connection with this, it is to be noted that the years of the assessments under consideration here represent the depth of the depression. The use of the average method results in the assessment lagging behind the general business conditions current at the time of the assessment. During times of increased security values, the current figures will be reduced by the average; in times of depression, the low current figures will be somewhat increased by the average. We see no injustice in this, especially in view of the fact that this method of valuation is simply taken as one of the evidences of value and not as conclusive in that respect. In connection with this, see *Louisville & N. R. Co. v. Coulter* (C. C.), 131 Fed. 282; *Chicago & N. W. R. Co. v. State,* 128 Wis. 553, 108 N. W. 557; *State v. Pullman Co.* 178 Wis. 240, 189 N. W. 543; *Chicago Union Traction Co. v. State Board of Equalization* (C. C.), 112 Fed. 607; *Norfolk & W. R. Co. v. Board of Pub. Works* (D. C.), 3 Fed. Supp. 791; *Great Northern Ry. v. Weeks,* 297 U. S. 135, 56 Sup. Ct. 426.

We now come to the method of arriving at the value of the common stock. The difficulties of the commission were complicated by the fact that, this being a wholly owned subsidiary of the North American Company, its common stock was not in the market, and thus some means other than listed value had to be adopted. The proper method of dealing with this problem is agreed upon by the parties, and we shall assume its propriety. A ratio must be obtained between the

earnings and market prices of stocks actively dealt in in the stock exchange, and this ratio must be applied to the earnings on plaintiff's own stock. The dispute arises over the selection of the stock with which comparison is to be made, and the manner of securing the three-year average. The accountant for the commission selected the common stock of the North American Company as that from which the ratio of earnings to market value was to be derived. He did this for the reason that, since the earnings of plaintiffs contributed substantially to those of the North American Company stock, it was fair to use the stock of that company as a measuring ratio. We consider this selection to be proper. Having selected this company as the source of the ratio, the accountant found the ratio by the following method:

For the 1932 assessment, he took the average market value of the North American stock for the year 1929, using the annual average method. He then ascertained the three-year average of the North American Company earnings per share for the years 1927, 1928, and 1929. He then ascertained the ratio between the 1929 value of the stock and its average earnings for the three years, thus obtaining the market rate of capitalization for the latter year. He then averaged the earnings of plaintiff for the same years, applied the market rate of capitalization to that average, and arrived at the market value of the common stock of plaintiffs for the year 1929. This process was repeated in such a way as to establish the value of the common stock for each of the following years up to and including 1933.

The principal complaint is that this method gives too great weight to 1929 and 1930 stock values of the North American Company, and that, since these were highly productive years, the result of the computation is evidently erroneous. Since this contention is true in fact, it becomes necessary to consider whether it has resulted in prejudice to plaintiff. It will not be profitable to discuss in detail the basis for our conclusion in this respect. It is enough to state that we have care-

fully examined the results of using market values of the North American Company stock for corresponding years in obtaining a ratio, and find no substantial difference in the figures. It is our conclusion that an application of the stock-and-bond method fails to disclose substantial injustice or grave error in the assessments.

Plaintiff's next claim is that the depreciated book-value test shows the assessments to be grossly excessive. Again, for reasons heretofore stated, the illustrations and discussion will be based on figures of the Milwaukee Company.

The Milwaukee Company claims a book value of $126,-711,929 for 1932, as compared with an assessment of $144,-000,000 for that year, and $123,302,057 for 1933, as compared with an assessment of $136,000,000. No useful service will be performed by a detailed discussion of the respects in which the Tax Commission and plaintiff differ as to the items properly constituting book value. We regard this method as of relatively little utility in testing the propriety of the assessment, although it may, of course, be taken into account by the commission. The depreciated book value has to do only with tangible property and reflects purchases at varying price levels. This assessment is under sec. 76.03, Stats., which requires the commission to assess "the property, both real and personal, including all rights, franchises and privileges . . . together as a unit." Assuming the book value as claimed by plaintiff, we see no basis upon which this court could conclude that the differences of $18,000,000 and $13,000,000 respectively between the book value of tangible assets and the assessments for the years in question, could not reasonably be accounted for by the intangible assets of the company. In view of the fact that application of the capitalization and stock-and-bond methods, both of which take into account these intangible values, justifies the assessment, it is difficult to see how this court could disturb it on the basis of the book value claimed by the plaintiff. In connection with this, see

*Chicago & N. W. R. Co. v. State,* 128 Wis. 553, 108 N. W. 557, and *State v. Pullman Co.* 178 Wis. 240, 189 N. W. 543. In the *Northwestern Case,* the appraisal of the physical property was $51,000,000 and the assessment was $71,000,000. In the *Pullman Case,* the *ad valorem* assessment was $1,800,-000, and the book value, $670,918.60. In both cases the assessment was sustained. In the *Northwestern Case* the court stated:

"One might as well try to value the life-blood of a horse, or his capacity to breathe, as try to place a value upon the visible part of railroad property separate from its rights, franchises and privileges."

It is next contended that the assessments against plaintiffs are greatly in excess of the valuation upon which they are permitted to earn a return. We consider this contention to be without merit for several reasons. So far as we can discover from the record, the only valuation by the railroad commission of the Milwaukee Company property for rate purposes was in 1914, and that of the plaintiff Wisconsin Company in 1918. The record shows that the property of each has so completely changed since these valuations as to make the use of this valuation carried forward by computation practically useless for the purposes of *ad valorem* assessment. Neither is it at all clear to us that a valuation for rate purposes, even though contemporaneous with the assessment, would have much bearing upon valuations for tax purposes. In an investigation into rates, the question is what property shall be allowed to earn a return. The actual earnings are disregarded in arriving at valuation for the reason that the very inquiry is into the proper amount of such earnings. Not so upon an *ad valorem* assessment, where the inquiry is into the actual total value of the property, and where it is proper to consider and capitalize net income to arrive at this value. We will not labor the point because, whether valid or not, it is at least clear to us that the commission was entitled to give greater

weight to results obtained by application of the stock-and-bond and capitalization methods than upon valuations for rate purposes, and that in this instance there was no reliable valuation for such purposes to which the commission was bound to give any particular weight.

As heretofore indicated, the discussion of the issues involved upon this appeal has been specifically addressed to the property of the Milwaukee Company· for the reason that the principal contentions are identical in principle. In one instance this is not true, and this requires us in conclusion briefly to dispose of a contention made by the Wisconsin Company.

In 1932, the plaintiff Wisconsin Company commenced abandonment of its railway utility in the city of Kenosha and the substitution therefor of a trackless trolley system. Plaintiff claims to have found itself with an inadequate depreciation reserve and adopted the principle of amortizing the loss of $687,003.99 involved in this operation by spreading the loss over four years and charging it to operating expenses. Plaintiff complains that, in spite of proof that depreciation reserves were not adequate to cover this loss, the commission and the trial court ignored its claim that the sum of $171,757 should be treated as annual operating expense.

We consider this contention to be unsound. It appears from the evidence that this property was abandoned, not by order of the public service commission, but in the exercise of the business judgment of the plaintiff. Since the existing property was abandoned before the end of its useful life, the depreciation reserve was not sufficient to meet the loss. In order to have a sufficient depreciation reserve at the time the property was abandoned, it would have been necessary to make a larger charge for depreciation. This would necessarily have come out of surplus. The surplus having been increased at the expense of depreciation reserve, it would seem proper that the loss be charged against surplus and not

as an expense of four years operations. The loss was actually so charged on the books of the plaintiff company. This was essentially a capital loss, and to deduct it, either in a lump sum, or in four instalments as operating expenses, would, under the capitalization method, reflect a total diminution of property value many times the loss. It is unnecessary to consider whether such a loss could be charged as operating expenses over the period of useful life of the property. This was not done, and, had it been, the charge would be too small to materially affect the valuation.

A careful examination of the record convinces us that the Tax Commission properly discharged its duties under the statute, and that the conclusions of the trial court were correct.

*By the Court.*—Judgments affirmed.

The following memorandum was filed June 24, 1936:

WICKHEM, J. (*on motion for rehearing*). Upon the motion for rehearing, plaintiffs contend, in view of the fact that numerous items rejected by the commission as operating expenses received no detailed consideration by this court, and in view of the fact that the conclusions of the commission and trial court were here approved, that the record is left in such state as to foreclose any future contention by plaintiffs that such items were erroneously dealt with by the commission. We think that there is no basis for such apprehension. These are evidentiary matters—not ultimate facts. No finding of the trial court specifically deals with them, and they were excluded from consideration by this court when the assumption was made for the purposes of the opinion that they had all been erroneously adjusted and the conclusion made that this would be immaterial to the result.

A motion for a rehearing was denied, with $25 costs in one case, on June 2, 1936.